**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| Jonie G., ) | |
| ) | |
|     *Plaintiff*, ) | |
| ) | Case No. 18 CV 50100 |
| v. ) | |
| ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, ) | |
| Commissioner of Social Security, ) | |
| ) | |
|     *Defendant*. ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Jonie G. brings this action under 42 U.S.C. § 405(g) challenging the denial of disability benefits. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision is reversed and remanded for further proceedings consistent with this Memorandum Opinion and Order.

### I. BACKGROUND

**A. Procedural History**

Plaintiff filed an application for disability insurance benefits and an application for supplemental security income on July 18, 2014. R. 264–71. Plaintiff initially alleged a disability date beginning April 10, 2010 but then amended to October 25, 2014. R. 285. The date last insured is December 31, 2014. R. 136. These applications were initially denied on October 29, 2014 and upon reconsideration on February 9, 2015. R. 121, 133, 150, 165. Plaintiff filed a written request for a hearing on March 2, 2015. R. 203–04. On April 5, 2016, a hearing was held by Administrative Law Judge (ALJ) Barry A. Miller. R. 76–109. Plaintiff, represented by an attorney, appeared and testified via video conference. An impartial vocational expert (VE)

also appeared and testified. After the hearing, the ALJ attempted to secure a medical source statement from Plaintiff's primary care provider, Dr. David Hansen. R. 992–93. Dr. Hansen responded stating that he did not perform a functional capacity evaluation on Plaintiff and is not managing her foot care. R. 1008. He did not provide an opinion regarding Plaintiff's functional capacity. *Id.*

On December 27, 2016, the ALJ issued his written opinion denying Plaintiff's claims for disability insurance benefits and supplemental security income. R. 180. Plaintiff appealed the decision to the Appeals Council, and the Appeals Council denied Plaintiff's request for review. R. 5–8. Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

**B. Medical History**

Plaintiff has a medical history of diabetes mellitus type 2, hypertension, lower extremity neuropathy, diabetic foot ulcers, and right knee arthritis. R. 24. Her great right toe was amputated in 2010. *Id.* Plaintiff developed a septic knee joint requiring arthroscopic irrigation and debridement on October 25, 2014. R. 847. In November of 2014, Plaintiff's left third toe was amputated due to osteomyelitis. R. 859.

Dr. Nathan Norem, Plaintiff's podiatrist, has treated Plaintiff's diabetic foot ulcers and diabetic neuropathy since 2010. R. 940. From November 2014 to January 2017, Plaintiff has seen Dr. Norem about forty-one times. *See* R. 24–75, 875–902, 945–90. In a February 27, 2015 medical source statement, Dr. Norem noted that Plaintiff could not walk a single block without pain, required a cane, could not lift ten pounds, could not stand for more than thirty minutes, must keep her feet elevated for 90% of a workday, could not sit for more than four hours, would be absent from work more than 25% of the time, needed to shift positions frequently, was

suffering from foot ulcers and neuropathy, and will continue to suffer infections and ulcerations for at least twelve months as her feet were deformed. R. 940–43.

In August 2016, Plaintiff had her left fourth toe amputated. R. 45. Plaintiff also had a revisional right foot first ray amputation in December 2016. R. 58. From September to December of 2016, Dr. Norem advised Plaintiff to elevate her feet and minimize activity. R. 47–56. In a January 26, 2017 letter, Dr. Norem wrote that Plaintiff cannot tolerate standing or walking for extended periods of time and that Plaintiff is potentially putting her life at risk every time she develops another foot ulceration. R. 21. Dr. Norem reiterated that his February 27, 2015 medical assessment included all of Plaintiff's ongoing issues including the need to elevate her foot because of swelling and the high risk of ulcerations. *Id.* He explained that while Plaintiff's swollen foot is not documented in every single note/visit, that does not mean it does not happen or will continue to happen. *Id.*

**C. The ALJ's Decision**

In his written decision denying Plaintiff's claim for benefits, the ALJ went through the five-step analysis for determining whether a person is disabled under the Social Security Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity. R. 173. At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, history of osteomyelitis, history of toe amputation, peripheral neuropathy, and degenerative joint disease of the left knee. R. 174. At step three, the ALJ found that Plaintiff had no impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, paying particular attention to listings 1.02, 1.05, 9.00, and 11.14. *Id.*

Before moving to step four, the ALJ determined that Plaintiff has a residual functional capacity (RFC), which is what Plaintiff can do despite her limitations, to perform sedentary work except she can lift and carry five pounds frequently and ten pounds occasionally, can stand and/or walk only with an assistive device and for no more than ten minutes at a time, can occasionally push and pull with the bilateral lower extremities, can occasionally climb ramps and stairs, balance, crouch, and crawl, can never climb ladders, ropes, or scaffolds or kneel, can frequently stoop, must avoid even moderate exposure to hazards, must avoid concentrated exposure to wetness and vibrations, must be allowed to change posture frequently, being able to shift between siting and standing for one minute at a time while remaining on task at least 85% of the time. R. 175.

At step four, the ALJ found that Plaintiff was capable of performing past relevant work as an administrative assistant and as a receptionist as generally performed. R. 180. Because of this finding at step four, the ALJ found that Plaintiff was not disabled and did not move on to step five. *See* 20 C.F.R. § 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

## II. STANDARD OF REVIEW

The reviewing court reviews the ALJ's determination to see if it is supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Accordingly, the reviewing court takes a very limited role and cannot displace the decision by reconsidering facts or evidence or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "The ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not

disabled, so that 'as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review.'" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)). An ALJ only needs to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). But even when adequate record evidence exists to support the ALJ's decision, the decision will not be affirmed if the ALJ does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19–20 (N.D. Ill. Oct. 29, 2014).

### III. ANALYSIS

On appeal, Plaintiff argues that reversal or remand is proper because the ALJ erred on four fronts: A) the listings analysis, B) the treating physician rule, C) Plaintiff's impairments, and D) Plaintiff's symptoms. For the following reasons, the Commissioner's decision is reversed and remanded.

**A. Listings**

Plaintiff first challenges the ALJ's findings that Plaintiff's impairments did not meet or medically equal listings 1.02, 1.05C, and 11.14. Specifically, Plaintiff argues that the ALJ failed to evaluate the evidence and did not provide enough explanation regarding step three to facilitate meaningful judicial review.

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Barnett v. Barnhart*, 381 F.3d 664,

668 (7th Cir. 2004)). In finding that Plaintiff's impairments did not meet listings 1.02, 1.05, and 11.14, the ALJ recited the criteria of each listing and simply stated that Plaintiff's impairments failed to meet each criteria of the listing. R. 174. This type of analysis is "the very type of perfunctory analysis" the Seventh Circuit has "repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing." *Minnick*, 775 F.3d at 935–36. In *Minnick*, the ALJ merely stated that the plaintiff's degenerative disc disease did not meet or equal listing 1.04 because "[t]he evidence does not establish the presence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication, as required by that listing." *Id.* at 935. The ALJ in *Minnick* failed to acknowledge several facts in the record that could in fact meet or equal the listing and dismissed that possibility in two sentences. *Id.* at 936. Here, the ALJ similarly dismissed the possibility that Plaintiff's impairments could meet any of the listings. Like in *Minnick*, the ALJ merely recited the requirements of each listing and stated, without any further support or analysis, that Plaintiff did not meet those requirements. The ALJ's listings analysis is perfunctory and deficient.

While seemingly acknowledging that the ALJ's listings analysis was perfunctory, the Commissioner argues that the ALJ provided an "in-depth" discussion of the medical evidence later in the opinion and cites to R. 175–79, which contains the ALJ's RFC analysis. While the Court will not discount the ALJ's listings analysis just because it appears elsewhere in the opinion, the Commissioner has not explained how the medical evidence cited constitutes the ALJ's listings analysis. Instead, the Commissioner points to a summary of Plaintiff's medical evidence, which makes no reference to any listing. A mere summary is not the same as meaningful analysis. *See Chuk v. Colvin*, No. 14 C 2525, 2015 WL 6687557, at *7 (N.D. Ill. Oct. 30, 2015) ("[S]ummarizing a medical history is not the same thing as analyzing it, in order

6

to build a logical bridge from evidence to conclusion."); *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480, at *4 (N.D. Ill. May 6, 2015) ("[M]erely summarizing medical evidence is not the same thing as analyzing it and explaining how the evidence supports the conclusion that the claimant is not disabled."). Thus, the Court finds that the ALJ did not analyze the listings later in the opinion.

Next, relying on *Scheck v. Barnhart*, 357 F.3d 697 (7th Cir. 2004), the Commissioner argues that the ALJ properly relied on the state agency physician opinions that a listing was not met. There are several problems with this argument. First, unlike *Scheck*, there is no evidence in this record that the ALJ in fact relied upon the state agency physician opinions to support his findings at step three. *See Davis v. Berryhill*, No. 416CV00196TABRLY, 2017 WL 4456722, at *2 (S.D. Ind. Oct. 6, 2017) ("However, unlike *Scheck*, the ALJ did not indicate that he accepted [the state agency physician's] opinion regarding medical equivalence."). The only reference the ALJ made to the state agency physician opinions was in regard to their opinions concerning Plaintiff's RFC. R. 179.

Second, even if the ALJ relied on the state agency physician opinions that "[n]o listing is met or equaled," the opinions indicate that the *only* listing considered was listing 1.08. *See* R. 117, 129, 146, 161. The fact that the state agency opinions mentioned listing 1.08 and did not mention listings 1.02, 1.05, or 11.14 suggests, by negative implication, that they did not consider listings 1.02, 1.05, or 11.14. *See Kristen G. v. Saul*, No. 18 CV 50121, 2019 WL 5208855, at *6 (N.D. Ill. Oct. 16, 2019). Finally, even if the state agency physicians considered these listings behind the scenes, the state agency physicians provided no explanation or analysis, making it impossible for this Court to follow their reasoning. This Court has rejected similar arguments in the past because they "rest[] on a series of attenuated inferences." *Id*.

7

The Commissioner argues that even if the listing analysis was perfunctory, Plaintiff had the burden of showing that she met or medically equaled the listing requirements, which she did not do. In effect, the Commissioner is arguing that the ALJ's perfunctory analysis was harmless error. *See Dock v. Berryhill*, No. 16 CV 50277, 2017 WL 5293901, at *5 (N.D. Ill. Nov. 13, 2017). An error is harmless only when a court can "predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). The Seventh Circuit has remanded where the listings analysis was perfunctory and there was some evidence indicating that the plaintiff may have met the listings. *See, e.g.*, *Minnick*, 775 F.3d at 648 ("Minnick's degenerative disc disease may well have satisfied Listing 1.04A."); *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("Because the only evidence in the record demonstrated significant limitations in Kastner's range of motion, the ALJ's contrary conclusion is peculiar and unexplained.").

Here, the facts support the application of harmless error for listing 1.05C[1] but not for listings 1.02 and 11.14 because the Court ultimately cannot "predict with great confidence that the result on remand would be the same." *Schomas*, 732 F.3d at 707.

First, there is evidence that Plaintiff's impairments could meet or equal listing 1.02. Plaintiff's argument is limited to her left knee joint, so only listing 1.02A applies.[2] To meet Listing 1.02A the following is required:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate

---

[1] Listing 1.05C requires amputation of "[o]ne hand and one lower extremity at or above the tarsal region, with inability to ambulate effectively[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1. Plaintiff points to no evidence indicating that Plaintiff's hand was amputated. Nor can the Court find any evidence in the record that Plaintiff's hand was amputated. Thus, Plaintiff has not established that there is any evidence indicating that she could meet this listing, and any omission in specifically analyzing this listing is harmless error.

[2] Listing 1.02B involves "one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand)[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1. Plaintiff cites no evidence relating to her upper extremity joints.

> medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. Pt. 404, Subpt. P, App. 1. Plaintiff points to her debridement and arthroscopic synovectomy of her left knee joint, limitation of movement in her left knee, chronic arthritic joint pain and stiffness, and her inability to ambulate effectively without an assistive device as evidence that she meets or medically equals listing 1.02A. The Court agrees that the record contains evidence that may support a finding that Plaintiff's degenerative knee joint meets or equals listing 1.02A.

The ALJ identified Plaintiff's degenerative joint disease of the left knee as a severe impairment. R. 174. He did not, however, discuss this impairment in his listing analysis. Nor did he discuss the other evidence that could support listing 1.02A. For example, x-rays of Plaintiff's left knee dated October 25, 2014 revealed "severe narrowing at the patellofemoral joint space. Bone spurring at the upper margin. Increased density in the suprapatellar region consistent with joint effusion." R. 843. Subsequent x-rays dated February 18, 2015 "show significant patellofemoral and lateral compartment degenerative changes." R. 936. In addition, Plaintiff testified that she had difficulty walking and the ALJ found in his RFC analysis that the plaintiff must be allowed to use an assistive device for all standing and walking, yet he did not discuss this in relation to listing 1.02A. Plaintiff's testimony and the medical evidence indicate that she suffered from chronic knee joint pain. R. 95–96 (describing knee pain as "sharp" and occurring "all the time."); R. 935 ("Of note she has underlying chronic arthritis and has been having chronic pain from this diagnosis."). There are signs of a limitation in motion in her left knee. R. 935 ("ROM: Lacks 5 degrees of knee extension[.]"); R. 938 (same). Again, the ALJ recognized this in his RFC analysis but did not discuss it in relation to his listings analysis. R.

177 (citing R. 935). The ALJ's failure to discuss this evidence warrants a remand for an analysis of listing 1.02A. *See Webber v. Colvin*, No. 03:13-CV-02088-AC, 2015 WL 1810205, at *5 (D. Or. Apr. 17, 2015) (remanding the listing 1.02 analysis where the ALJ did not consider the plaintiff's diagnosis of severe degenerative joint disease in both knees, her subjective reports of pain, and her use of a cane and wheelchair).

The ALJ's perfunctory listing 11.14 analysis is also not harmless error. Plaintiff's argument is limited to listing 11.14A, which requires "[d]isorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities." *Id.* "Disorganization of motor function" means "interference, due to your neurological disorder, with movement of two extremities[,]" and "[e]xtreme limitation" means, among other possibilities, "you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes." *Id.*

Here, the record contains evidence that plaintiff's impairments could meet or equal listing 11.14A. For example, both Dr. Norem, Plaintiff's podiatrist, and Dr. Hansen, Plaintiff's primary care provider, consistently found that Plaintiff suffers from diabetic peripheral neuropathy, diminished protective sensation and diminished sensation to light touch. *See* R. 24–75, 906, 945–90. The ALJ identified peripheral neuropathy as a severe impairment. R. 174. Yet, the ALJ never considered this severe impairment when analyzing listing 11.14. Additionally, Plaintiff's testimony and the medical evidence supports an extreme limitation in the ability to balance while standing or walking. At the hearing, Plaintiff testified that she could only stand for a few minutes at a time and that she always uses an assistive device (cane or crutches) to walk or stand. R. 98. Dr. Norem opined that Plaintiff must use a cane or other hand-held

10

assistive device when occasionally walking or standing. R. 942. He also opined that Plaintiff could not "tolerate standing or walking for extended periods of time" and had "poor balance[,]" which "puts her at risk of falling[.]" R. 21.

The Commissioner argues that Plaintiff has not shown that her interference with movement of her two extremities was *due to her neurological disorder*. However, Dr. Norem specifically opined that Plaintiff's poor balance resulted from her neuropathy and toe amputations. R. 21. There is at least some evidence to support that Plaintiff's peripheral neuropathy could meet or equal listing 11.14A, and therefore, the ALJ's perfunctory analysis was not harmless.

As far as medical equivalency of listings 1.02 and 11.14, the ALJ never made a finding one way or the other. While the ALJ found that Plaintiff did not "meet or medically equal" listing 1.05 (amputation), he only found that Plaintiff's impairments did not "meet" listings 1.02 and 11.14. R. 174. He remained silent as to whether Plaintiff's impairments equaled listings 1.02 and 11.14. Medical equivalence means Plaintiff's impairments are at least equal in severity and duration to the criteria of a listed impairment. 20 C.F.R. § 404.1526(a). On remand, the ALJ should properly analyze whether Plaintiff's impairments meet *or* equal listings 1.02A and 11.14A. The ALJ should consult a medical expert to opine on medical equivalency. *See Minnick*, 775 F.3d at 935 ("A finding of medical equivalence requires an expert's opinion on the issue.").

An updated medical opinion from a medical expert is also warranted due to the additional evidence that the state agency physicians did not review. *See* SSR 96-6p, 1996 WL 374180, at *4 (July 2, 1996) ("[A]n administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is

received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."). The state agency physicians' opinions were dated October 16, 2014 and February 06, 2015. R. 121, 133, 150, 165. There are numerous exhibits in the record after these dates that may bear on the listings 1.02A and 11.14A analysis. For listing 1.02A, at least one of the state agency physicians did not consider the October 25, 2014 knee x-rays, R. 843. Neither state agency physician considered the February 18, 2015 knee x-rays, R. 936, or the post-operative visits with Dr. Joshua Blomberg following Plaintiff's left knee debridement and synovectomy. R. 935–39. Regarding listing 11.14A, the additional evidence includes Dr. Norem's physical medical source statement dated February 27, 2015, R. 940–43, all the medical visits with Dr. Norem after February 2015, R. 58–67, 952–82, and all the medial visits with Dr. Hansen after February 2015. R. 32, 906, 961, 975.

The Commissioner argues that Plaintiff failed to raise the argument that Plaintiff met or equaled listings 1.02 or 11.14 at the hearing and did not ask the ALJ to secure an additional opinion on medical equivalence. The Commissioner argues that the proper inference is that Plaintiff, who was represented by counsel, "decided that another expert opinion would not help her." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010). In *Buckhanon*, the Seventh Circuit affirmed the ALJ's decision because the ALJ expressly relied on the medical judgment of state agency physicians whose opinions were uncontradicted. *Id.* Here, the ALJ did not rely on the state agency physicians' opinions, their opinions were largely contradicted by Dr. Norem's opinion, and their opinions were based on incomplete medical records as described above. *Buckhanon* is inapplicable in this case. On remand, the ALJ should properly analyze whether Plaintiff's impairments meet *or* equal listings 1.02A and 11.14A.

**B. Treating physician rule**

Plaintiff next argues that the ALJ erred by not properly applying the treating physician rule to Dr. Norem's opinion. A treating physician's opinion is entitled to controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is "not inconsistent with the other substantial evidence in the case." 20 C.F.R. § 404.1527(c);[3] *see also Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). A treating physician has "greater familiarity with the claimant's condition and circumstances[,]" and therefore an ALJ may only discount a treating physician's opinions based on "good reasons" supported by substantial evidence in the record. *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

The treating physician rule is a two-step process. *See* 20 C.F.R. § 404.1527(c); *Wallace v. Colvin*, 193 F. Supp. 3d 939, 946 (N.D. Ill. 2016). First, the ALJ must give "controlling weight" to a treating physician's opinion if it is (i) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (ii) "not inconsistent with the other substantial evidence in [the] case." 20 C.F.R. § 404.1527(c)(2). Here, the ALJ did not adequately analyze the first step. The ALJ stated that he gave "little weight" to Dr Norem's opinions because they overstate the claimant's limitations and are not consistent with the available evidence, including evidence from Dr. Norem's office. The ALJ provided two examples to support this finding. He stated that Dr. Norem's treatment notes did not support the opinion that Plaintiff must keep her

---

[3] The Social Security Administration recently modified the treating-physician rule to eliminate the "controlling weight" instruction. *See* 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources."). However, the new regulations apply only to disability applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply."), *with* 20 C.F.R. § 404.1520c ("For claims filed (see § 404.614) on or after March 27, 2017, the rules in this section apply."). Plaintiff's applications in this case was filed in 2014. Accordingly, the ALJ was required to apply the treating physician rule when deciding Plaintiff's applications.

13

foot elevated or that Plaintiff would be off task or miss work as frequently as Dr. Norem's opinion stated. R. 178. The Seventh Circuit has found such an "inconsistency" as "splitting hairs unfairly" where the treating physician's treating notes failed to tell the plaintiff to elevate her legs, but the RFC questionnaire said she must do so. *Stage v. Colvin*, 812 F.3d 1121, 1126, 1126 n.1 (7th Cir. 2016). Courts have also repeatedly pointed out that there is a difference between a physician's progress notes for purposes of treatment and his ultimate opinion as to Plaintiff's ability to work. *See Sampson v. Comm'r of Soc. Sec.*, 694 F. App'x 727, 735 (11th Cir. 2017); *Brownawell v. Comm'r Of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008); *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007) ("The primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations.").

The ALJ also summarized in a footnote the medical evidence that he believed supported his statement that the medical records do not support Dr. Norem's opinions. The ALJ impermissibly cherry picked the evidence in support of his finding while omitting other evidence that supports Dr. Norem's opinions. At other points he outright mischaracterized the evidence. For example, the ALJ stated that Plaintiff's foot ulcers consistently healed without issue. This is incorrect because it was the failure of the foot ulcers to heal that led to the amputation of two of Plaintiff's toes in 2010 and 2014 and two more in 2016. R. 24, 45, 58, 859. Her infected right foot ulcers resulted in hospitalization for three days in 2011. R. 758. Following her left toe amputation in 2014 through 2016, Plaintiff suffered numerous ulcers on her feet, several of which became infected and required oral antibiotics to treat. R. 875–902, 945–90. Often, as one ulcer would heal a new one would develop. In addition, the ALJ noted that Dr Norem's records do not note any chronic lower extremity edema. However, on each visit, Dr Norem noted trace

14

bilateral lower extremity edema.  R. 24–75, 875–902, 945–90.  This pattern of repeated ulcerations of her feet, some severe enough to require amputation, coupled with the chronic trace edema in her lower extremities, all support Dr. Norem's opinions.  However, the ALJ merely disregarded these facts.  The ALJ may not cherry pick those facts that support his conclusion and omit those that do not.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Kimberly L. W. v. Berryhill*, No. 17 C 50281, 2019 WL 354980, at *6 (N.D. Ill. Jan. 29, 2019).

The ALJ also erred at the second step of the treating physician rule.  At the second step, if the ALJ does not give controlling weight to a treating physician's opinion, he cannot simply disregard it but must determine what specific weight it should be given.  The ALJ must "consider *all* of the following factors in deciding the weight [to] give to any medical opinion"—examining relationship, treatment relationship (length and nature of treatment relationship and frequency of examination, along with nature and extent of the treatment relationship), supportability, consistency, specialization, and other factors.  20 C.F.R. § 404.1527(c) (emphasis added).  These "checklist" factors are designed to help the ALJ "decide how much weight to give to the treating physician's evidence."  *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Here, the ALJ gave "little weight" to Dr. Norem's opinion but never addressed the checklist factors.  Failing to address these factors at step two is error and by itself warrants a remand.  *See, e.g.*, *Kimberly L. W.*, 2019 WL 354980, at *5; *Wallace*, 193 F. Supp. 3d at 947.  Specifically, the ALJ never addressed the length, nature, or extent of the treating relationship.  According to Dr. Norem's February 27, 2015 opinion, he states that he was Plaintiff's treating physician for her chronic foot ulcerations and diabetic neuropathy since 2010.  R. 940.  The ALJ also did not discuss the number of times Plaintiff saw Dr. Norem.  Based on the record, Plaintiff saw Dr. Norem approximately forty times from November 2014 to January 2017.  *See* R. 24–75,

15

875–902, 945–90. The ALJ did not address how, if at all, he factored the length, nature, and frequency of this treating physician relationship into his determination to give little weight to Dr. Norem's opinion. 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). These factors may weigh in favor of giving greater weight to Dr. Norem's opinion, and the ALJ's failure to address them was error.

The Commissioner argues that the ALJ did in fact consider the treating relationship because he noted that Plaintiff "continued to receive podiatric care with Dr. Norem," and Dr. Norem's treatment "was comprised of excisional debridement, application of antibiotic ointment and management of shoe gear." R. 177. However, the Commissioner has no factual basis for making this assumption. Merely summarizing Plaintiff's visits with Dr. Norem may indicate that the ALJ was aware of the treating relationship but does not mean that he considered it when determining what weight to give to Dr. Norem's opinion. *See Chuk*, 2015 WL 6687557, at *7; *Alevras*, 2015 WL 2149480, at *4.

With regard to the specialty factor, the ALJ stated that Dr. Norem is a "podiatrist, and not a medical doctor[,]" and that several portions of his opinion exceeded his expertise. R. 179. The ALJ does not explain how the fact that Dr. Norem is a podiatrist and not a medical doctor is relevant. The issue is not whether a podiatrist is a medical doctor but whether a podiatrist is an acceptable medical source. *Isureal v. Colvin*, No. 3:15 CV 221 (JGM), 2017 WL 9730203, at *16 (D. Conn. May 31, 2017), report and recommendation adopted 2018 WL 1409797 (D. Conn. Mar. 21, 2018) (finding that the ALJ erred by giving a podiatrist's opinion no weight simply because she "is not a medical doctor."). Under the regulations, a licensed podiatrist is an acceptable medical source for establishing that Plaintiff suffers from impairments related to her

feet and ankles. *See* 20 C.F.R. § 404.1513(a)(4) (2016). Illinois law defines podiatry to include ailments of the human foot and ankle, including amputations. 225 ILCS 100/5 (2016). To the extent that the ALJ gave "little weight" to Dr. Norem's opinion because he was a podiatrist and not a medical doctor, this was error.

The ALJ also failed to identify which portions of Dr. Norem's opinions exceed his expertise. Dr. Norem opined on Plaintiff's RFC, her need to elevate her legs, and her need to be off task for 25% or more on a workday. R. 942–43. His opinion relates to Plaintiff's ulcerations and neuropathy in her feet. R. 940. As such, it is not apparent to this Court what portions of Dr. Norem's opinions go beyond his expertise. On remand, if the ALJ declines to give controlling weight to Dr. Norem's opinions, the ALJ must identify and explain what portions of his opinion exceed his expertise in the treatment of the foot.

The ALJ's failure to follow the treating physician rule cannot be deemed harmless. Dr. Norem opined that Plaintiff must elevate her leg 90% of a workday and that Plaintiff will be off-task greater than 25% of a workday. R. 942–43. At the hearing, the VE testified that an individual in Plaintiff's circumstances would not be able to perform her past jobs, generally and as performed, if she was required to elevate her leg. R. 105. The VE further testified that an employee must be on-task 85% of the workday, which would preclude Plaintiff if she was off-task greater than 25% of the workday. R. 106. Thus, the weight accorded to Dr. Norem's opinion could well be outcome determinative in this case.

It is certainly true that a state agency physician's opinion can be credited over a treating physician's opinion. To do so, however, an ALJ must have "good reasons" supported by substantial evidence in the record. *Campbell*, 627 F.3d at 306. Here, the ALJ simply has not provided "good reasons," for crediting the state agency physicians' opinions over Dr. Norem's

opinion. In remanding this case, this Court is not suggesting that the ALJ was required to reach a particular conclusion. *Moore*, 743 F.3d at 1124. The Court recognizes that there is conflicting evidence, but this is even more reason why it is imperative to properly apply the treating physician rule, as well as other applicable regulations and case law. In light of the above, the Court finds that a remand is also warranted for failing to comply with the treating physician rule. Because the case is remanded to fully consider whether Plaintiff met or medically equaled listings 1.02A or 11.14A and to fully discuss and apply the factors set forth in the treating physician rule, this Court need not address the remaining issues raised by Plaintiff.

## IV. CONCLUSION

For the reasons stated in this opinion, Plaintiff's motion for summary judgment [22] is granted, and the Commissioner's motion for summary judgment [32] is denied. The decision of the Commissioner is reversed and remanded for further proceedings consistent with this Memorandum Opinion and Order.

Date: December 10, 2019	By:	_[signature]_
		Lisa A. Jensen
		United States Magistrate Judge